884 F.2d 1274
 UNITED STATES of America, Plaintiff-Appellant,
v.
Robert Richardson KIMBALL, aka Robert Anthony Glynn, aka
Robert Glyn Bland; Brian Peter Daniels; Bruce Emil Aitken;
Edward Joel Seltzer; William Henry Harris; Stephen Paul
Illenberger; David Lyle Boese, aka James Michael Shannon;
Thomas Tuttle, aka John Patrick Lyons, Defendants-Appellees.
 No. 89-10011.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 15, 1989.
Decided Sept. 7, 1989.
As Amended Oct. 16, 1989.
 
 Brian L. Sullivan, Asst. U.S. Atty., Reno, Nev., for plaintiff-appellant.
 David Z. Chesnoff and Kenneth G. Freitas, Goodman, Stein & Chesnoff, Las Vegas, Nev., for defendants-appellees.
 Richard Mazer, San Francisco, Cal., for defendant-appellee Tuttle.
 Appeal from the United States District Court for the District of Nevada.
 Before HUG, HALL and O'SCANNLAIN, Circuit Judges.
 HUG, Circuit Judge:
 
 
 1
 The Government brings this interlocutory appeal pursuant to 18 U.S.C. Sec. 3731 in order to challenge the district court's suppression of evidence in the trial of Robert Richardson Kimball on money laundering charges. The district court ordered the evidence suppressed after concluding that the Government had violated Kimball's rights under Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). We affirm.
 
 I.
 
 2
 In November 1987, Kimball and several other individuals were arrested in Reno, Nevada after unsuccessfully attempting to launder over seven million dollars. As a result of this incident, Kimball was indicted and charged with conspiracy to defraud the United States, launder money, and evade financial reporting requirements, in violation of 18 U.S.C. Sec. 371 (1982); aiding and abetting money laundering, in violation of 18 U.S.C. Secs. 2, 1956(a)(1) (1982 & Supp. IV 1986); aiding and abetting international money laundering, in violation of 18 U.S.C. Secs. 2, 1956(a)(2) (1982 & Supp. IV 1986); attempted evasion of financial reporting requirements, and aiding and abetting the same, in violation of 18 U.S.C. Sec. 2 (1982) and 31 U.S.C. Sec. 5324(1) (Supp. IV 1986); and aiding and abetting interstate travel to promote racketeering, in violation of 18 U.S.C. Secs. 2, 1952(a)(3) (1982).[1] Kimball was arraigned and pled not guilty on November 18, 1987. He is currently being held without bail pending trial of his case. At all times relevant to this appeal, he was similarly incarcerated.
 
 
 3
 In the year preceding Kimball's arrest, Drug Enforcement Administration ("DEA") agents were, in an independent investigation, attempting to infiltrate the drug trade in Bangkok, Thailand. Toward this end, the DEA recruited two confidential informants, Informant A and Informant B. Several months after Kimball's arrest, the DEA asked Informant A to meet with Brian Daniels, an old friend with whom Informant A had done marijuana deals in the past. The stated purpose of this meeting was twofold. First, Informant A was to determine whether Daniels was involved in any active marijuana operations. Second, he was to ascertain whether any connection existed between Daniels and the Reno money laundering case. Despite the DEA's interest in the Reno arrests, Reno officials were apparently, at this point, unaware of the Bangkok investigation.
 
 
 4
 Informant A met with Daniels in late January 1988. During their meeting, Daniels mentioned that, due to police intervention, he had recently lost several million dollars in Reno. He further claimed that, as a consequence of the aborted Reno venture, he had been unable to collect approximately 18 million dollars that was owed him. Finally, Daniels identified Kimball as an individual connected to the Nevada currency seizure.
 
 
 5
 Informant A included Informant B in subsequent meetings with Daniels. At those meetings, the trio explored the possibility of working together on a marijuana smuggling scheme. In addition, Daniels, who was still concerned about the money he had been unable to retrieve, asked Informant A and B if they knew anyone who could help him collect and transfer the funds. Informant A and B agreed to help, thereafter introducing Daniels to two men they claimed had handled money collection problems for them in the past. In reality, these two individuals were undercover agents William Harper and James Devaney, DEA agents out of Miami, Florida.
 
 
 6
 Daniels told Harper and Devaney to return to the United States and establish contact with Kimball. He claimed that Kimball was the only individual in a position to coordinate the transfer of his money. So that Kimball would trust the two men, Daniels gave them a business card with a code phrase on the back. According to Daniels, he and Kimball were the only ones who knew the meaning of the phrase.
 
 
 7
 Harper and Devaney contacted the Reno officials in charge of Kimball's case on February 16, 1988. After apprising them of the status of the DEA's covert operation, the agents requested permission to meet with Kimball. Because he was concerned about the possible constitutional implications of such a meeting, the Assistant United States Attorney handling the money laundering prosecution initially refused to allow the interview. Nevertheless, authorization was ultimately obtained from the Department of Justice in Washington, D.C. Thus, on February 20, 1988, Harper and Devaney met with Kimball in prison. In this unrecorded meeting, which lasted for two hours, Kimball allegedly acknowledged the significance of the business card sent by Daniels and agreed that a sum of money was owed to Daniels. He declined, however, to cooperate further with the agents because he had not been told that they were coming. Although he allegedly promised to get back to Harper and Devaney by telephone, he never did so.
 
 
 8
 In the months following their interview with Kimball, Harper and Devaney stayed in touch with Daniels, often through Informant A and B. During March 1988, the two agents successfully resolved an unrelated money collection problem for Daniels. In April, however, Harper advised Daniels that no progress had been made in the Kimball collection operation and asked to be put in contact with people who could assist him in reaching Kimball. Daniels told Harper to contact Jack Hill, Kimball's attorney, but Harper's numerous attempts to do so proved unsuccessful.
 
 
 9
 From April 12 through April 15, 1988, Harper and Devaney had meetings with Daniels in Hong Kong. During one of these meetings, Daniels informed the agents that Kimball and David Boese, one of Kimball's codefendants, were in charge of the marijuana load that had generated the money seized in Reno. He also provided them with the names of everyone who had an ownership interest in that marijuana along with the amount of each person's interest. Finally, Daniels told Harper and Devaney that Kimball had contacted him through Hill and arranged for delivery of the money. He suggested that the agents visit Hill after returning to the United States and gave them several letters for delivery to his associates affirming that the agents represented his interests.
 
 
 10
 Despite renewed efforts, Harper and Devaney remained unable to contact Hill after their visit to Hong Kong. Harper therefore suggested to Daniels in June that Hill be bypassed and Kimball approached directly. Specifically, Harper told Daniels to write a letter to Kimball and send it to Harper for delivery to Kimball in prison. Although this plan was executed, Harper never received a response from Kimball. Daniels, however, claimed that Kimball was in touch with him through Hill and that plans for the delivery of the money were progressing.
 
 
 11
 Throughout June and July, discussions regarding the disposition of the money continued. During this time period, Harper and Devaney were also trying to convince Daniels to travel with them to the United States. However, when the agents met with Daniels in Zurich toward the end of July, it became obvious that Daniels intended to return to Bangkok rather than proceed to the United States. Thus, on July 25, 1988, the agents had Daniels arrested on a provisional warrant in Switzerland.
 
 
 12
 As a result of the information gleaned from the DEA's covert investigation, a superseding indictment was returned against Kimball and his confederates on September 13, 1988. In addition to the counts charged in the original indictment, the new indictment accuses Kimball of conspiracy to aid and abet the distribution of a controlled substance, a violation of 18 U.S.C. Sec. 2 (1982) and 21 U.S.C. Sec. 841(a)(1) (1982).[2] The superseding indictment also adds Daniels and another individual, Bruce Aitken, to the list of Kimball's alleged co-conspirators.
 
 
 13
 Prior to trial, Kimball filed a motion to suppress, claiming that his Sixth Amendment right to counsel was violated when Harper and Devaney met with him in prison without his counsel's presence. The district court agreed that such conduct is proscribed by Massiah, 377 U.S. at 201, 84 S.Ct. at 1199. In an attempt to remedy the situation created by the Government's misconduct, the district judge ordered suppressed all statements made by Daniels after the date on which Kimball's constitutional rights were infringed. It is from this suppression order that the Government now appeals.
 
 II.
 
 14
 "The sixth amendment guarantees that 'In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence.' " United States v. Pace, 833 F.2d 1307, 1310 (9th Cir.1987) (citation omitted), cert. denied, --- U.S. ----, 108 S.Ct. 1742, 100 L.Ed.2d 205 (1988). This Sixth Amendment right is violated whenever an agent of the Government deliberately elicits incriminating statements from an indicted defendant in the absence of counsel. See Massiah, 377 U.S. at 201, 84 S.Ct. at 1199; see also Brewer v. Williams, 430 U.S. 387, 401, 97 S.Ct. 1232, 1240, 51 L.Ed.2d 424 (1977) ("the clear rule of Massiah is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him" (footnote omitted)); Brooks v. Kincheloe, 848 F.2d 940, 944 (9th Cir.1988) (discussing Massiah ). The Government is guilty of "deliberately eliciting" information if it intentionally creates a situation likely to induce an indicted defendant to make incriminating statements without counsel's assistance. See United States v. Henry, 447 U.S. 264, 270-71, 100 S.Ct. 2183, 2186-87, 65 L.Ed.2d 115 (1980); Brooks, 848 F.2d at 944.
 
 
 15
 Given the circumstances of the present case, it is beyond doubt that the district court was correct when it concluded that the Government violated Kimball's Sixth Amendment rights.[3] Indeed, a more blatant infringement of Massiah 's precepts is difficult to imagine. When undercover agents Harper and Devaney contacted Kimball in prison on February 20, 1988, Kimball had been arrested, indicted, and arraigned. Thus, his Sixth Amendment right to counsel clearly had attached. See Cahill v. Rushen, 678 F.2d 791, 793 (9th Cir.1982) (citing Kirby v. Illinois, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972)). Further, it is undisputed that Kimball's counsel, Jack Hill, was not present at the February 20 meeting. Finally, by seeking Kimball's assistance in locating the proceeds of Daniels' drug dealings, the very money Kimball stands accused of attempting to launder, Harper and Devaney were obviously "creating a situation likely to induce [Kimball] to make incriminating statements" regarding crimes for which he had been indicted. Henry, 447 U.S. at 274, 100 S.Ct. at 2189; see Harris, 738 F.2d at 1071. Massiah expressly proscribes such conduct.
 
 
 16
 Having concluded that a constitutional violation occurred, we now turn to the more difficult question that lies at the heart of this appeal: What is the appropriate scope of the relief to be afforded Kimball? The Government argues strenuously that the only proper remedy for a Massiah violation is suppression of any statements that have been improperly elicited from the defendant. We agree that the Constitution requires no less. See Massiah, 377 U.S. at 207, 84 S.Ct. at 1203 (holding that "the defendant's own incriminating statements, obtained by federal agents under the circumstances ... disclosed, could not constitutionally be used by the prosecution as evidence against him at his trial" (emphasis omitted)). In Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), however, the Supreme Court concluded that more may at times be necessary to neutralize the taint produced by governmental misconduct. Specifically, the Nix Court held that violation of Massiah requires suppression of all derivative evidence gleaned through exploitation of the Government's wrongdoing. Id. at 441-43, 104 S.Ct. at 2507-08; see also Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963) (announcing suppression rule for all "fruits of the poisonous tree"). Thus, the appropriate remedy for a violation of Massiah includes not only suppression of all evidence directly obtained through governmental misconduct, but also suppression of all evidence that can properly be designated the fruits of that conduct.
 
 
 17
 In the present case, the district judge concluded that the violation of Kimball's Sixth Amendment right to counsel was not adequately redressed simply because the Government agreed to the exclusion of all statements made by Kimball to Harper and Devaney during their February 20 meeting. He therefore ordered suppressed all statements by Kimball's alleged co-conspirator, Daniels, made after the date on which Kimball's constitutional rights were infringed. The district judge justified his actions as follows:
 
 
 18
 [I]t seems to me the court cannot fully protect the constitutional rights of a defendant if I permit in evidence as to that defendant, evidence which has been acquired subsequent to and as a consequence of illegal conduct, and that's what I would be doing if I permitted [Daniels' statements] to be admitted as to Mr. Kimball, subsequent to the February 20th date.
 
 
 19
 In effect, this ruling constitutes a determination by the district court that Daniels' post-February 20 statements must be excluded as fruits of the Government's unlawful conduct.
 
 
 20
 When determining whether a particular piece of evidence is the fruit of police illegality, we ask "whether, granting establishment of the primary illegality, the evidence to which ... objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun, 371 U.S. at 488, 83 S.Ct. at 417 (citation omitted). We have further held that in order for evidence to be suppressed as the fruit of a constitutional violation, the violation must at a minimum have been the "but for" cause of the discovery of the evidence. See, e.g., United States v. Miller, 822 F.2d 828, 830-31 (9th Cir.1987). Applying these standards to the present controversy, we conclude that Daniels' post-February 20 statements were properly designated fruits by the district court.[4]
 
 
 21
 When Harper and Devaney contacted Kimball in prison thereby violating his constitutional rights, they did so in order to foster Daniels' trust and advance the objectives of their undercover operation. Had the two agents refused to meet with Kimball as instructed, the integrity of the DEA's covert investigation would clearly have been jeopardized. Indeed, the Government concedes as much. That being the case, it is not difficult to conclude that but for the agents' willingness to compromise Kimball's rights, Harper and Devaney would not have been in a position to engage in further communication with Daniels. Having held themselves out as money collectors, they could hardly have refused Daniels' orders without arousing his suspicions. They therefore engaged in unconstitutional conduct in order to cement their relationship with Daniels, a relationship that led to the disclosures at issue here. We recognize that this case is somewhat atypical in that it was the fact of the constitutional violation, itself, rather than any uncounseled statements gleaned from Kimball that led to the later accumulation of the challenged evidence. We see no reason, however, why this circumstance should alter our analysis. Daniels' statements were "come at by exploitation of" the Government's misconduct. They were thus properly the subject of a suppression order.
 
 
 22
 In reaching this conclusion, we do not mean to suggest general disapproval of governmental undercover investigations. We recognize that "in this case, as in many cases, it was entirely proper to continue an investigation of the suspected criminal activities of the defendant and his alleged confederates, even though the defendant had already been indicted." Massiah, 377 U.S. at 207, 84 S.Ct. at 1203; see also Harris, 738 F.2d at 1071 n. 2. We hold only that when the Government chooses to violate a defendant's Sixth Amendment rights in order to advance its undercover objectives, it must be prepared to live with the consequences of that decision.
 
 
 23
 Exclusion of Daniels' post-February 20 statements from Kimball's trial on the charges for which he was initially indicted was an appropriate remedy under the circumstances of this case. The district court's suppression order is therefore AFFIRMED.
 
 
 
 [1]
 Kimball's codefendants--Edward Seltzer, William Harris, Stephen Illenberger, David Boese, and Thomas Tuttle--were similarly charged, and, at this point, it appears that the district court intends to try all six defendants in a single proceeding. The suppression order from which the Government appeals, however, is applicable only to Kimball. We therefore express no opinion regarding the admissibility of the suppressed evidence with respect to the remaining defendants
 
 
 [2]
 This distribution count has been severed by the district court and is not at issue in this appeal. Rather, the district court's suppression order pertains only to those crimes for which Kimball was originally indicted
 
 
 [3]
 Although we would affirm the district court's conclusion under any standard, we note that this circuit treats the question of whether the Government has created a situation likely to induce an indicted defendant to make incriminating statements as an essentially factual inquiry subject to review only for clear error. See United States v. Harris, 738 F.2d 1068, 1071 (9th Cir.1984) (citing United States v. McConney, 728 F.2d 1195, 1202-04 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984))
 
 
 [4]
 A district court's fruits determination seems most aptly characterized as a mixed question of law and fact with serious constitutional implications. See United States v. Leon, 468 U.S. 897, 911, 104 S.Ct. 3405, 3414, 82 L.Ed.2d 677 (1984) (noting that the taint doctrine "is a product of considerations relating to the exclusionary rule and the constitutional principles it is designed to protect" (citations omitted)). We therefore engage in de novo review. See McConney, 728 F.2d at 1203 (mixed questions implicating constitutional rights properly reviewed de novo ). Compare United States v. Dozier, 844 F.2d 701, 707 (9th Cir.) (application of Leon good faith exception reviewed de novo ), cert. denied, --- U.S. ----, 109 S.Ct. 312, 102 L.Ed.2d 331 (1988)