**UNITED STATES of America, Plaintiff,**

v.

**Daren Keith McCOY, Defendant.**

**Cr. No. 93–119–FR.**

United States District Court,
D. Oregon.

Dec. 20, 1993.

Jack C. Wong, U.S. Atty., Michael J. Brown, Asst. U.S. Atty., Portland, OR, for plaintiff.

Steven T. Wax, Federal Defender, Portland, OR, for defendant.

## OPINION

FRYE, Judge:

The matter before the court is the motion of defendant to suppress evidence and statements (# 18).

## FACTS

Shortly after midnight on New Year's Eve, 1992, the police received a report that guns were being fired into the air from a residence at 6207 N.E. 15th Street. The act of firing guns into the air in celebration of the New Year is common in this area of the city. In response to the report that guns were being fired into the air at this residence, the police set up surveillance and, over a five to ten minute period, watched as a man went from the house to the yard three times, discharging a handgun into the air on each occasion. The police recognized the man as Daren McCoy, a convicted felon. Reinforcements were called. The police then surrounded the house and placed a radio call to the occupants advising them that the house was surrounded and they were to leave the house one by one.

As each occupant left the house, he or she was ordered to raise his or her hands and to walk backwards toward the street. The occupants of the house included Daren McCoy, his live-in female companion, Edwina Jones, her two-year-old son, her nine-year-old son, and her sixteen-year-old son. Jones came out of the house first, holding the two-year-old in her arms. She was handcuffed still holding the baby and escorted to a police car. Her nine-year-old son was handcuffed and escorted to a second police car. Her sixteen-year-old son was ordered to the ground, handcuffed, and taken to a third police car. McCoy was the last to leave the house. He was ordered to the ground, handcuffed, and taken to a fourth police car. The process of securing each of the occupants took approximately five to seven minutes.

McCoy, Jones and her sixteen-year-old son testified that the police entered the house with a police dog shortly after the last occupant, McCoy, left. The police officers testified that they could not recall whether a protective sweep of the house had occurred shortly after McCoy had left. Officer Dan McGetrick testified, however, that a protective sweep of the house would be routine under the circumstances. The court finds

that the police made a protective sweep of the house after the occupants had departed.

. . Officer McGetrick testified that he obtained the consent of McCoy to search the house. McCoy testified that he did not give Officer McGetrick consent to search the house, but he admitted that he was "extremely drunk" at the time. Officer McGetrick testified that he asked Jones for consent to search the house, but that Jones refused to give her consent.

Officer Cynthia Lauer testified that she had a conversation with Jones about ten minutes after Jones had left the house and approximately three to five minutes after McCoy had left the house and been detained. Officer Lauer testified that Jones was upset, saying "my kids, my kids." Officer Lauer testified that Jones calmed down when her nine-year-old son was brought to the police car where Jones was being held. Officer Lauer testified that she informed Jones that the reason for the police action was to arrest McCoy for possession of a firearm, and that the police knew that guns were in the house. Officer Lauer then asked Jones if the police could enter the house and search for the guns. Officer Lauer testified that Jones said "yeah, go ahead." Jones admitted that she consented to the search of her house. She stated that she wanted to avoid having the police, whom she had already seen enter the house with a canine unit, tear the house apart in a search for the guns.

Between the time that Jones left the house and the time that she had the discussion with Officer Lauer, Jones talked to her mother and sister from her position in the police car. The mother and sister of Jones had called by telephone to wish the family a Happy New Year during the time the occupants of the house were leaving the house. Before McCoy left the house he had answered the telephone and told the mother and sister of Jones that the police were there. The mother and sister of Jones lived nearby, and they arrived shortly after Jones had been handcuffed.

Jones testified that she was neither advised of her right to refuse to consent to the search of the house, nor given *Miranda*

warnings. No officer testified that Jones had been advised of *Miranda* warnings.

The police found a .38 caliber pistol in a dresser drawer in the bedroom of the house and .38 caliber ammunition, and a .22 caliber pistol in the hall closet.

## CONTENTIONS OF THE PARTIES

The government has conceded that the arrest of McCoy was illegal under precedent established by the United States Court of Appeals for the Ninth Circuit. The government contends, however, that the search of the residence was lawful because Jones had consented to the search. McCoy contends that the consent given by Jones was tainted by the illegal arrest of McCoy, was not voluntarily made, and is tainted by the illegal seizure of Jones.

## ANALYSIS AND RULING

■■■ An arrest may not be made in a residence in the absence of a warrant. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Police may not order people out of a house to circumvent this rule unless exigent circumstances are present. *United States v. Al–Azzawy*, 784 F.2d 890 (9th Cir.1985), *cert. denied*, 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986); *United States v. Gooch*, 6 F.3d 673 (9th Cir.1993). Since the government concedes that *Al–Azzawy* and *Gooch* apply in this action, under the rule of *Al–Azzawy*, the arrest of McCoy was unlawful, and any consent he may have given to search the residence is tainted by his unlawful arrest.

1. *Did Jones freely and voluntarily consent to the search of the residence?*

■■■ When a court finds facts indicating that consent has been given, it still must determine whether consent was "freely and voluntarily" made under the totality of circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The question is whether undue pressure or coercion was brought to bear on the consenting party, thereby impermissibly tainting the voluntariness of the consent. The government has the burden of demon-

strating that the consent to a warrantless search was voluntary. *United States v. Ritter*, 752 F.2d 435, 439 (9th Cir.1985). Voluntariness is a question of fact to be determined from all of the surrounding circumstances. *Id.* Some of the factors used in examining the totality of circumstances are the use of threat of force, threats regarding the consequences of refusing consent, custody, lack of warnings of the right to refuse consent, and the consenting party's susceptibility to coercion.

■ Jones provided consent to Officer Lauer to search the residence while she was handcuffed in the police car with her two-year-old son. Officer Lauer testified that the conversation resulting in the consent of Jones to search the residence occurred about ten minutes after Jones was ordered out of the house. Officer McGetrick testified that it took approximately five to seven minutes for the other occupants of the house to leave the house. Officer Lauer testified that Jones was visibly upset, but calmed down when her nine-year-old son was brought to her. Jones testified that she observed the police enter the house with a police dog shortly after McCoy left the house.[1] Officer Lauer talked to Jones approximately five to seven minutes after McCoy's arrest and a few minutes after Jones saw the police enter the house. Jones testified that she consented to the search of the house and told Officer Lauer where one of the guns was located "because ... I didn't want them to tear my house apart." Transcript of Motion to Suppress Proceedings, p. 55.

In *United States v. Al–Azzawy*, the police surrounded a trailer with guns drawn and ordered the occupants to leave. When Al–Azzawy emerged, he was ordered to his knees and was not free to leave. 784 F.2d at 893. According to the police, Al–Azzawy and his wife were both asked if the trailer could be searched and that they consented to the search. The Ninth Circuit Court of Appeals addressed the issue of whether the consents of Al–Azzawy and his wife were voluntary under the circumstances. The court held that the consents were not voluntary based on two factors: 1) Mrs. Al–Azzawy had been approached by several police officers with their guns drawn while Mr. Al–Azzawy remained on his knees with his hand on his head; 2) the Al–Azzawys were never informed of either their *Miranda* rights or their rights to refuse consent to the search. *Id.* at 895. Despite this finding that the consents to search were not voluntary, the court held that the search was valid based on exigent circumstances because they had probable cause to believe that the house contained explosives and that innocent persons might be in danger. The circumstances under which Jones provided consent to search are not significantly distinguishable from the circumstances surrounding Mrs. Al–Azzawy's consent. Therefore, the consent of Jones was not freely and voluntarily given under the totality of the circumstances.

2. *Was the consent to search given by Jones tainted by the illegal arrest of McCoy?*

■ When consent to search is elicited and given following an illegal arrest, the consent to search is the result of the "chain of presumptive coercion." Because the illegal arrest triggers the exclusionary rule, the consent is tainted as part of the "fruit of the poisonous tree," and the government must show that sufficient attenuation has occurred to free the consent from the taint. *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939). This is called the "attenuation doctrine." *Searches and Seizures*, William E. Ringel, Vol. 1, § 3.3(c) (1st Ed.1993).

■ In deciding whether consent is the fruit of illegal police conduct, the Ninth Circuit Court of Appeals has relied on cases regarding the admissibility of confessions made after an illegal arrest, primarily *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). *See United States v. Wellins*, 654 F.2d 550 (9th Cir.1981); *United States v. George*, 883 F.2d 1407, 1416 (9th

---

1. Although neither officer testifying at the hearing recalled whether or not the police entered the house to secure it after the occupants had left, Officer McGetrick testified that a protective sweep was routine in situations like this one and may have been done here. The court finds the testimony of Jones and McCoy as to this matter to be uncontroverted and reasonable.

Cir.1989). In the *Wellins* and *George* cases, the Ninth Circuit Court of Appeals has examined three factors derived from *Brown* to determine whether the consent was sufficiently attenuated from the illegal conduct: 1) the length of time between illegal police conduct and the consent; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the illegal conduct.

Where the Ninth Circuit Court of Appeals has applied the attenuation doctrine, the issue has been whether the consent of the *defendant* was attenuated from the illegal arrest. Here, McCoy argues that the consent of a *third-party*, Jones, a co-inhabitant of the house, was tainted by McCoy's illegal arrest, and that the attenuation doctrine should be applied to invalidate Jones' consent to search the residence. The Ninth Circuit has not considered whether the attenuation doctrine should be applied to invalidate the consent of a co-inhabitant present at the time of a defendant's illegal arrest.

Although this is an issue of first impression in the Ninth Circuit, the Tenth Circuit Court of Appeals has applied the attenuation doctrine in circumstances similar to those in this case. In *United States v. Maez*, 872 F.2d 1444 (10th Cir.1989), the police suspected that Maez had been involved in a bank robbery. The police placed the trailer home of Maez under surveillance. Two hours later, the police surrounded the trailer home and ordered the occupants out of the trailer using loudspeakers. There were rifles pointed at the house. From a window in the trailer, Mrs. Maez saw her fifteen-year-old son, who had been outside, walking across the street with his hands in the air. Although the son was not a suspect in the robbery, he was handcuffed on the street in front of the house. Maez and his wife were asked to leave the trailer home one at a time.

When Mrs. Maez left the trailer home with her two-month-old baby, she was escorted to the outer fence of the trailer park past approximately ten police officers. Thereafter, Mrs. Maez was asked to read and sign a consent form authorizing a search of the trailer home by the local police. She signed the form. Mrs. Maez was then asked to sign an FBI consent form. She was told that her husband had been arrested. An FBI agent explained that they would be looking for guns, money and ammunition. Mrs. Maez was visibly upset, but signed the second consent form.

The Tenth Circuit Court of Appeals ruled that the arrest of Maez violated his fourth amendment rights under *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). *Maez*, 872 F.2d at 1451. The court then addressed the issue of whether the consent to search given by Mrs. Maez was tainted by the illegal arrest of her husband. The government argued that because Mrs. Maez had not been arrested, her consent to search the trailer home could not be tainted by the prior arrest of her husband. Relying on *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), where the defendant was permitted to raise the issue of taint as to statements made by his employees, the Tenth Circuit ruled that the taint of an illegal arrest could extend to a spouse present at the time of the illegal arrest of her husband.

The Tenth Circuit Court of Appeals applied the three-factor test from *Brown* to determine whether the consent of Mrs. Maez was sufficiently attenuated to purge the taint of the illegal arrest of her husband. Applying the first factor, the court concluded that Mrs. Maez signed the consent form close in time to the illegal arrest of her husband and she was in close proximity to the trailer home. Applying the second factor, the court determined that there were "no intervening circumstances of any significance" to purge the taint of the illegal arrest. *Maez*, 872 F.2d at 1455. With respect to the third factor, the court stated that the "manner of the arrest ... created a frightening scene for the Maez family." *Id.* The court noted that Mrs. Maez was upset when she signed the form, had watched her fifteen-year-old son being handcuffed, and was holding her two-month-old baby from the time she left the trailer home throughout the signing of the consent forms. Considering these factors, the court concluded that the consent of Mrs. Maez had been tainted.

Based on the reasoning of *Maez*, this court will apply the three-factor test from *Brown*

in this case. As to the first factor, the temporal proximity of the arrest to the giving of the consent, the Ninth Circuit Court of Appeals stated that "[a]s best we are aware, no court has weighed the first factor against a defendant when his inculpatory statement followed illegal police conduct by only a few hours." *United States v. George*, 883 F.2d at 1416. In this case, the consent to search was provided by Jones within fifteen minutes of the illegal arrest of McCoy.

The government argues that the second factor, the presence of intervening circumstances, created the necessary attenuation to purge the taint of McCoy's illegal arrest. In particular, the government points to the fact that Jones was allowed to talk to her mother and sister while in the police car within minutes after the illegal arrest of McCoy. In *George*, the Ninth Circuit Court of Appeals listed several factors which would qualify as intervening circumstances under this prong of the *Brown* test including, but not limited to, the defendant's release from custody, an appearance before a magistrate, or a consultation with an attorney. *Id.* at 1416. The *George* court determined that these intervening circumstances create a sufficient filter between the illegal police conduct and the act of consent.

The fact that Jones was briefly permitted to consult with her mother and sister while handcuffed in a police car with her children is not akin to the consultation with an attorney contemplated in *George*. *See also United States v. Wellins*, 654 F.2d 550 (9th Cir. 1981). The opportunity to talk to one's family for approximately three to five minutes, while handcuffed in a police car in the presence of several officers, is not a significant enough event to filter out the harmful effect of the illegal police conduct.

The final factor to be considered in the *Brown* analysis is the purpose and flagrancy of the official misconduct. Here, the circumstances are substantially similar to those in *Maez*. If the manner of Maez's arrest created "a frightening scene for the Maez family," the effect was multiplied in this case. Not only was Jones ordered out of the house after being informed it was surrounded, it was past midnight and there was snow on the

ground. The officers testified that a police dog was present and guns were drawn as the occupants of the house were asked to walk down the path backwards. Jones watched as her sixteen-year-old son was told to lie down in the snow dressed in a t-shirt and slippers and handcuffed. Jones watched as her nine-year-old son was handcuffed. Jones was handcuffed with her baby in her arms. Jones saw the police and a police dog enter the house shortly after McCoy left the house. Ten to fifteen armed officers were present at the scene.

Although Jones was told that the purpose of the police action was to secure McCoy, her handcuffs were not removed, and she was not told that she was free to go. Unlike Mrs. Maez, Jones was not informed that she was not under arrest and was not advised of her right to refuse consent. With respect to the last *Brown* factor, the manner of the arrest and subsequent events in this case were disorienting and frightening to Jones and her family.

Here, the conduct of the officers in ordering all of the occupants outside in the snow, handcuffing them, detaining them in separate police cars in the presence of a significant number of officers and police vehicles for the purpose of effecting the warrantless arrest of McCoy for the crime of a felon in possession of a firearm persuades this court that this third factor does not weigh sufficiently against McCoy to overwhelm the two factors that weigh in his favor. Considering all three *Brown* factors, the consent of Jones was not an "independent decision" that was completely unrelated to McCoy's initial unlawful arrest that the Ninth Circuit requires under the *Brown* test. *See United States v. George*, 883 F.2d 1407 (9th Cir.1989).

## CONCLUSION

Based on the foregoing reasons, the motion of McCoy to suppress evidence and statements (# 18) is granted.