**UNITED STATES of America, Plaintiff,**

v.

**Jose REYES, Francisco Medina, and Thomas Rodriguez, Defendants.**

**No. S3 04 CR 872 (SAS).**

United States District Court, S.D. New York.

April 17, 1996.

---

Bruce G. Ohr, Thomas A. Arena, Assistant United States Attorney, New York City, for U.S.

Diarmuid White, New York City, Don D. Buchwald, Buchwald & Kaufman, New York City, for Defendant Jose Reyes.

Lee Ginsberg, Freeman, Nooter & Ginsberg, New York City, for Defendant Thomas Rodriguez.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

Defendant Jose Reyes ("Reyes") has moved to suppress evidence consisting of approximately $3,800 in cash and several pieces of jewelry. For the reasons set forth below, his motion is granted.

## I. *Factual Background*

### A. *Discussions between Vargas and Reyes at Otisville*

From January 17, 1995 until February 2, 1995, Raul Vargas ("Vargas") and Reyes were both inmates at the federal correctional facility at Otisville, New York. On several occasions while at Otisville, Reyes, Vargas, and "Nino" (Gilbert Cervantes, a defendant in a companion case) allegedly discussed the possibility of Vargas, Nino, and another person fleeing to the Dominican Republic if they were released on bail. Transcript of Hearing held on April 8 and 9, 1996 ("Tr.") at 14. According to Vargas, Reyes told Vargas that he knew Vargas was "the only one" who "could really hurt" Reyes (Tr. at 11), and Reyes indicated that he could provide Vargas with financial assistance in order to flee. If Vargas' testimony is credited, Reyes' statements evidence an awareness that his [Reyes'] associates might decide to cooperate with the Government and could potentially provide the Government with inculpatory information about Reyes.

### B. *Receipt of money and jewelry by Vargas*

On February 19, 1995, Vargas entered into a cooperation agreement with the Government. Between March and June 1995, Vargas taped a series of conversations with Reyes, as well as conversations with other people. According to the Government, some of these conversations concerned the plan for Reyes to give Vargas the financial means to flee, although the cryptic nature of the intelligible portions of the conversations makes such a reading somewhat strained. In any event, Vargas alleges that he was in fact given money and jewels by Reyes' stepfather, Jacobo Perez (a.k.a. "Pancho"). Tr. at 16, 24, 28. The transfers allegedly occurred on two separate occasions: on May 31, Perez gave Vargas $3,000, and on June 2, Perez gave him three pieces of jewelry. Tr. at 24,

27–28; Government Exhibit ("GX") 1 at 37; GX 4 at 3. According to Vargas, he turned over the jewelry to ATF agents immediately after receiving it from Perez. Tr. at 28.[1] Vargas also states that he received an additional $800 from Nino and Reyes' girlfriend. Tr. at 30. This transfer occurred sometime after Vargas was released from prison on bail. *Id.* Together, the $3,000 and the $800 comprise the $3,800 the Government seeks to introduce.

### C. *Vargas' contacts with Dimarys*

At the hearing, Reyes submitted as evidence transcripts of two recorded conversations between Vargas and Dimarys, Reyes' girlfriend (*see* Tr. at 97). These conversations occurred on May 17 and May 19, 1995. *See* Defendant's Exhibit ("Def.Ex.") A, C. In these conversations, Vargas states that Reyes instructed him to speak with Dimarys. He also discusses the plan for Vargas and Nino to flee, with Reyes' financial assistance. Def. Ex. A at 6, 7, 10; Def. Ex. C at 8, 9, 11, 14. Moreover, at several points in the conversations (which Vargas instructs Dimarys to report to Reyes), it appears that Vargas is almost threatening Reyes. For example, Vargas says "tell him that . . . if he's gonna help me as he said . . . that I'm ready, because I'm supposedly not gonna be waiting." Def. Ex. A at 15. He also tells Dimarys that "time is running short" (*see* Def. Ex. A at 13) and directs her to "tell him that I want to do that as soon as possible . . . because . . . he knows that I know what's what . . . what's going on with these people." Def. Ex. C at 9 (ellipses in original). At the hearing, Vargas acknowledged that he (Vargas) was trying to advance the plan to flee, in part because Nino wasn't pushing the plan forward. Tr. at 101–102.

### D. *Government's position*

The Government contends that some of the conversations taped by Vargas reveal that Reyes arranged for Vargas to be given mon-

---

1. Vargas also allegedly received another piece of jewelry from Perez, which he discovered in his gym bag upon returning home from the meeting with the ATF agents to whom he turned over the first three pieces of jewelry. The Government does not seek to introduce this piece of jewelry (a bracelet studded with diamonds, rubies, emeralds and sapphires) because it does not have it. Vargas contends that he sold this piece in order to pay for the burial of a recently deceased friend. Tr. at 29–30.

ey and jewelry in order to help Vargas flee (and thereby preclude Vargas from becoming a Government informant). *See* GX 1 at 37; GX 4 at 3. While the Government does not seek admission of the tapes at trial (*see* discussion at Part II, *infra*), it does want to introduce the money and jewelry. The Government's theory, presumably, is that these items are probative of Reyes' consciousness of guilt. Reyes' actions in providing financial assistance to Vargas may suggest that Reyes believed that Vargas could incriminate him.

## II. *Tapes as a Massiah Violation*

█ Reyes earlier moved to suppress the taped conversations between Reyes and Vargas on the ground that the recordings were made in violation of his Sixth Amendment right to counsel. As stated above, Vargas began cooperating with the Government on February 19, 1995, before the taped conversations with Reyes occurred. Tr. at 161. Thus at the time he taped his conversations with Reyes and others, Vargas was an agent of the Government. Once a defendant has been indicted and his Sixth Amendment right to counsel has attached, incriminating statements deliberately elicited from the accused by law enforcement officers or their agents may not be admitted as evidence at the trial of the charges alleged in the indictment. *See Maine v. Moulton,* 474 U.S. 159, 180, 106 S.Ct. 477, 489, 88 L.Ed.2d 481 (1985); *United States v. Henry,* 447 U.S. 264, 274–75, 100 S.Ct. 2183, 2188–89, 65 L.Ed.2d 115 (1980); *Massiah v. United States,* 377 U.S. 201, 205–06, 84 S.Ct. 1199, 1202–03, 12 L.Ed.2d 246 (1964); *Jenkins v. Leonardo,* 991 F.2d 1033, 1037 (2d Cir.), *cert. denied,* 510 U.S. 884, 114 S.Ct. 231, 126 L.Ed.2d 186 (1993).

While the Government has not explicitly conceded that the recordings were made in violation of *Massiah,* it has said that it will not seek to offer them at trial during its case-in-chief, during its rebuttal case, or for impeachment purposes. *See* Letters of Thomas A. Arena, Assistant United States Attorney, dated March 26, 1996 and March 29, 1996. In view of the Government's position, the Court will assume for the purposes of this motion that the recording of the conversations constitutes a *Massiah* violation.

## III. *Discussion*

Reyes now argues that not only must the taped conversations be excluded as evidence, but that any evidence obtained as a result of those conversations must also be excluded under the "fruit of the poisonous tree" doctrine. *See Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963). However, a *Wong Sun* analysis may not be required because the evidence may have been obtained as a direct result of the *Massiah* violation.

### A. *Money and jewelry as direct evidence of Massiah violation*

█ Under this analysis, the evidence at issue (*i.e.* money and jewelry) is not the fruit of a *Massiah* violation at all. Challenged evidence can be characterized as "primary" or "direct" when, for example, it is "a confession or admission made in response to questioning, or physical evidence obtained by search or arrest." 1 Wayne R. Lafave & Jerold H. Israel, *Criminal Procedure* § 9.3 (1984). By contrast, "secondary" or "derivative" evidence may consist of "a confession ... obtained after an illegal arrest, physical evidence ... located after an illegally obtained confession, or an in-court identification ... made following an illegally conducted pretrial identification." *Id.* Only with secondary evidence must a court determine whether the evidence is tainted. In such cases, the government takes some legal action after the initial illegal conduct. For instance, the government may obtain a search warrant based on an illegally-obtained confession. The search warrant itself is legal, but because it was issued in reliance upon information illegally obtained, the fruits of the search must be suppressed.

Here, no legal steps were taken (such as procuring a search warrant) as a result of Vargas' conversations with Reyes. Reyes' act of forwarding money and jewelry to Vargas was a direct consequence of the *Massiah* violation engendered by Vargas' contact with Reyes. Thus the money and jewelry are primary evidence rather than secondary. With primary evidence, no attenuation analysis is required. Because the Government

(presumably mindful of *Massiah* ) has decided not to offer the taped conversations into evidence, and because the money and jewelry are as primary as Reyes' statements, the Government is precluded from offering the money and jewelry at this trial.

### B. *Fruit of the poisonous tree*

Alternatively, an analysis of the evidence as fruit of the poisonous tree yields the same result.

#### 1. *Applicable law*

Assuming a Constitutional violation (as I am for the purpose of this Opinion), at a minimum the taped conversations between Vargas and Reyes must be suppressed. *Massiah,* 377 U.S. at 207, 84 S.Ct. at 1203–04. However, "more may at times be necessary to neutralize the taint produced by governmental misconduct." *United States v. Kimball,* 884 F.2d 1274, 1278 (9th Cir.1989). In *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the Supreme Court held that "violation of *Massiah* requires suppression of all derivative evidence gleaned through exploitation of the Government's wrongdoing." *Kimball,* 884 F.2d at 1278 (citing *Nix,* 467 U.S. 431, 441–43, 104 S.Ct. 2501, 2507–09, 81 L.Ed.2d 377 (1984)). In so holding, the *Nix* Court noted that "the 'fruit of the poisonous tree' doctrine has not been limited to cases in which there has been a Fourth Amendment violation." *Nix,* 467 U.S. at 442, 104 S.Ct. at 2508. For example, in *United States v. Wade,* 388 U.S. 218, 241–42, 87 S.Ct. 1926, 1939–40, 18 L.Ed.2d 1149 (1967), the Court applied the doctrine in the case of a Sixth Amendment violation. *See also United States v. Terzado–Madruga,* 897 F.2d 1099, 1112–13 (11th Cir.1990); *United States v. Marshank,* 777 F.Supp. 1507, 1519 n. 11 (N.D.Ca.1991).

■■■ The question, then, is whether the jewelry and money were "gleaned through exploitation of the Government's wrongdo-

ing." *Kimball,* 884 F.2d at 1278. As the Supreme Court has held, courts must inquire whether "the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963). In *Brown v. Illinois,* the Supreme Court listed several factors to be considered in determining whether evidence was discovered by means sufficiently attenuated from the illegal conduct. These factors include the temporal proximity of the illegal conduct and the procurement of evidence; the presence of intervening circumstances; and "the purpose and flagrancy of the official misconduct." *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975).[2] In addition, "the burden of showing admissibility rests ... on the prosecution." *Id.* at 604, 95 S.Ct. at 2262; *see also Alderman v. United States,* 394 U.S. 165, 183, 89 S.Ct. 961, 972, 22 L.Ed.2d 176 (1969).

#### 2. *Brown* factors

■■ The first factor, proximity between illegal conduct and procurement of evidence, is primarily considered in situations where the illegal conduct is an invalid search or arrest. In such situations, courts typically assess the time lapse in minutes or hours. *See, e.g., Brown,* 422 U.S. at 604, 95 S.Ct. at 2262 (less than two hours separated defendant's first statement from his illegal arrest); *United States v. Gregory,* 79 F.3d 973, 979–80 (10th Cir.1996) (consent to search given less than 35 seconds after police returned defendant's license and registration after illegally stopping him); *United States v. Richardson,* 949 F.2d 851, 859 (6th Cir.1991) (consent to search given 20 minutes after illegal arrest); *United States v. Ceballos,* 812 F.2d 42, 49–50 (2d Cir.1987) ("the consents to search were given within a few minutes of

---

**2.** *Brown* was decided in the context of an alleged violation of the Fourth Amendment. However, the *Wong Sun* analysis and *Brown* factors are relevant to an attenuation analysis in the context of a Sixth Amendment violation as well. *See Kimball,* 884 F.2d at 1278 (citing *Wong Sun* in face of alleged Sixth Amendment violation);

*United States v. Restrepo,* 890 F.Supp. 180, 196 (E.D.N.Y.1995) (*Brown* factors "are applied in this and other circuits to determine whether evidence obtained as a result of a constitutional violation should be suppressed as an illegal fruit").

the illegal arrest"); *United States v. Cherry,* 794 F.2d 201, 206 (5th Cir.1986), *cert. denied,* 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987) (approximately 24 hours between illegal arrest and consent to search); *United States v. Webster,* 750 F.2d 307, 324–25 (5th Cir.1984), *cert. denied,* 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985) (lapse of almost 12 hours between illegal arrest and defendant's statement); *United States v. McCoy,* 839 F.Supp. 1442, 1447 (D.Or.1993) (consent to search provided within 15 minutes of illegal arrest); *United States v. Weston,* 519 F.Supp. 565, 571–72 (W.D.N.Y.1981) (defendant gave statement six hours after improper roadside questioning).

Under the facts of this case, however, such a measure of attenuation does not adequately indicate whether the causal connection between the governmental misconduct and the challenged evidence has been broken. For example, Reyes' first taped conversation with Vargas was on March 21, 1995 (Tr. at 85); Vargas later spoke with Reyes' girlfriend on May 17 and 19 (Def.Ex. A, C); and the jewelry and money were given to Vargas on May 31 and June 2 (Tr. at 24, 27–28; GX 1 at 37; GX 4 at 3). However, each conversation between Vargas and Reyes was an independent and continuing violation of *Massiah.* According to the Government's various discovery letters, it appears that Vargas spoke with Reyes on March 21, 26, 28–29, April 17–19, 21–22, May 15–17, 19, 25, 27, 29, 31 and June 1–2. Even if there was an interval of time between the last conversation with Reyes and the production of the jewelry (which appears unlikely), a time lapse alone is not dispositive of attenuation. *See Brown,* 422 U.S. at 603, 95 S.Ct. at 2261 ("[n]o single fact is dispositive"; rather, the question "must be answered on the facts of each case"); *see also United States v. Cherry,* 759 F.2d 1196, 1211 (5th Cir.1985) ("The relative importance of each [*Brown* ] factor[ ] in any particular case of course depends on the circumstances of that case.").

Another *Brown* factor is the purpose and flagrancy of the governmental misconduct. The government's misconduct here was flagrant. In providing Vargas with recording equipment and instructing him to record conversations, the ATF could have had no other purpose besides attempting to obtain evidence that might incriminate Reyes in the charges on which he had been indicted. Thus this factor weighs in favor of suppressing the evidence. Like the first factor, purpose of the misconduct alone is not dispositive, although the *Brown* Court notes that it is particularly relevant. *See Brown,* 422 U.S. at 604, 95 S.Ct. at 2262.

The remaining factor to consider is the presence or absence of intervening circumstances. In most cases, such circumstances involve the Government's releasing the defendant, or reading the defendant his *Miranda* rights [3], or giving the defendant an opportunity to consult with family members or an attorney. That is, the circumstances intervening between the illegal conduct and the procurement of evidence consist of some affirmative act taken by the Government that helps to purge the taint of prior illegal conduct. *See, e.g., Johnson v. Louisiana,* 406 U.S. 356, 365, 92 S.Ct. 1620, 1626, 32 L.Ed.2d 152 (1972) (intervening hearing before magistrate, at which suspect was advised of rights, purged the taint from a lineup following an illegal arrest); *Devier v. Zant,* 3 F.3d 1445, 1459 (11th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 1125, 130 L.Ed.2d 1087 (1995) (after illegal detention, defendant was given access to friends and family, and opportunity to enlist legal assistance); *Cherry,* 794 F.2d at 206 (intervening circumstance was the "development of independently procured probable cause following an illegal arrest;" it was a "critical factor [and] attenuat[ed] the taint of the initial illegal arrest"); *Webster,* 750 F.2d at 325 (implying that intervening circumstances that might purge taint include ability to contact family or friends and appearance before a magistrate); *United States v. Berry,* 670 F.2d 583, 605 (5th Cir.1982)

---

**3.** However, *"Miranda* warnings alone do not break the causal connection between police misconduct and a subsequent statement." *United States v. Webster,* 750 F.2d 307, 324 (5th Cir. 1984) (citing *Brown,* 422 U.S. at 603, 95 S.Ct. at

2261–62; *Dunaway v. New York,* 442 U.S. 200, 216–17, 99 S.Ct. 2248, 2258–59, 60 L.Ed.2d 824 (1979)); *see also United States v. Restrepo,* 890 F.Supp. 180, 198 (E.D.N.Y.1995).

(defendants "were allowed to consult with each other," and were invited "to use a telephone when [one defendant] indicated that she might want to contact an attorney"); *United States v. Wellins,* 654 F.2d 550, 555 (9th Cir.1981) (defendant was allowed to consult with his attorney and was at least once advised of his *Miranda* rights prior to giving consent to search hotel room; defendant was also permitted a phone conversation with person who was co-registered with him at the hotel); *Restrepo,* 890 F.Supp. at 199 ("Consultation with counsel is sometimes considered an 'intervening circumstance' which may dissipate taint;" however, consultation with attorney was insufficient to dissipate taint when the attorney did not believe herself to represent the defendant and did not understand the purpose for which she was to meet with him); *McCoy,* 839 F.Supp. at 1447 (intervening circumstances may include "defendant's release from custody, an appearance before a magistrate, or a consultation with an attorney").

No such circumstances exist in this case. Nothing occurred that might have cured the illegality of a government agent speaking with Reyes post-indictment without the presence of Reyes' counsel. At no time did the Government inform Reyes that Vargas was cooperating with the Government, and at no time did the Government (or Vargas) suggest to Reyes that he might want to have counsel present during his conversations with Vargas. To be sure, *Brown* suggests that "an act sufficiently a product of free will" may break "the causal connection between the illegality" and the obtaining of evidence. 422 U.S. at 603, 95 S.Ct. at 2261–62. But the Government's argument that Reyes exercised free will in forwarding money and jewelry to Vargas rings hollow. When Reyes was acting of his own accord, prior to the intense prodding of the Government's agent, he did not in fact provide any money to Vargas to assist his flight. It was only after Vargas became a Government agent, and increased the urgency and tenor of his demand, that Reyes actually produced the money and jewelry. Arguing that Reyes acted of his own free will in producing these items is no different than saying that Reyes acted of his own free will when he spoke to Vargas.

This is not a case of a defendant's will being overborne by the coercive nature of an arrest or a search. Reyes had no way of knowing that in speaking with Vargas (and in any actions he took as a result of those conversations) he was actually dealing with the Government.

### C. Policy and balancing of interests

Underlying these analyses, of course, are the theories behind the exclusionary rule and the "fruit of the poisonous tree" doctrine. As to the former, one court has held that "[i]n the ... sixth amendment context, the 'prime purpose' of the exclusionary rule as applied to the fruits of police illegality is deterrence of government denial of the ... counsel right." *United States v. Brookins,* 614 F.2d 1037, 1047 (5th Cir.1980) (citing *United States v. Calandra,* 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974)). Deterrence is also one of the goals supporting the requirement that the fruits of the poisonous tree be suppressed: when there is a close causal connection between illegal conduct and evidence obtained as a result of that conduct, "not only is exclusion of the evidence more likely to deter similar police misconduct in the future, but use of the evidence is more likely to compromise the integrity of the courts." *Dunaway v. New York,* 442 U.S. 200, 218, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979); *see also United States v. Preston,* 608 F.2d 626, 633 (5th Cir.1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 794 (1980) (citing *Dunaway*).

In deciding whether evidence must be suppressed, courts implicitly balance the government's (or public's) interest in the admission of relevant and probative evidence against the defendant's (or public's) interest in the protection of his constitutional rights. Both interests are valid, and both are compelling. But the courts must not let the Government benefit from its misconduct by putting it in a better position than it would have occupied absent its constitutional violations. *See, e.g., Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 391–92, 40 S.Ct. 182, 182–83, 64 L.Ed. 319 (1920); *Olmstead v. United States,* 277 U.S. 438, 484–85, 48 S.Ct. 564, 574–75, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting);

*Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 2508–09, 81 L.Ed.2d 377 (1984). To admit the evidence at issue here would do just that. If the Government wishes to seek an indictment of Reyes on separate charges of obstruction of justice, it is free to do so. But the evidence at issue here was obtained in violation of Reyes' Sixth Amendment right to counsel. Consequently, neither the money nor the jewelry may be admitted at the trial of Reyes on the current indictment.

## IV. *Conclusion*

As stated above, Reyes' motion to suppress the evidence is granted. In addition, I must address one outstanding motion. For the reasons set forth in *United States v. Cherry,* 876 F.Supp. 547 (S.D.N.Y.1995), with which this Court agrees, the motion of nonparty New York City Police Department to quash Reyes' Rule 17(c) subpoenas is granted.

SO ORDERED.