Filed 11/13/13  P. v. Hernandez CA1/1

### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br> ROBERT VALENTINO HERNANDEZ,<br><br>    Defendant and Appellant. | A132652<br><br>(Contra Costa County<br>Super. Ct. No. 05-080107-6) |

Defendant Robert Valentino Hernandez was found guilty of two counts of second degree murder with associated firearms and gang enhancements.  He contends the trial court erred in admitting evidence of incriminating statements he made to his cellmate because his cellmate was acting as an agent of the government at the time the statements were made.  According to defendant, this testimony should have been excluded under *Massiah v. United States* (1964) 377 U.S. 201 (*Massiah*), which held an individual's Sixth Amendment right to counsel is violated by the use of evidence of incriminating statements deliberately elicited from the individual by government agents after indictment and in the absence of counsel.  Finding no error, we affirm.

### I.  BACKGROUND

Defendant was charged by information on February 6, 2008, with two counts of murder (Pen. Code,[1] § 187), one count of shooting at an inhabited dwelling (§ 246), one count of conspiracy (§ 182, subd. (a)(1)), and one count of participation in a criminal street gang (§ 186.22, subd. (a)).  The information also alleged the offenses were

---

[1] All statutory references are to the Penal Code, unless otherwise specified.

committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)) and defendant personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (b), (c), (d) & (e)(1)).

We only briefly summarize the underlying facts of the crime because they are not pertinent to the appeal. On February 13, 2007, at approximately 11:00 p.m., a woman and her 14-week-old fetus were killed when approximately 30 shots were fired into her home during a drive-by shooting. No witness testified to seeing defendant fire the shots, but several witnesses provided circumstantial evidence tying him to the shooting.

Perhaps the strongest evidence connecting defendant to the killings were incriminating statements made by him to Jason Treas. Treas had known defendant and his parents since defendant was born and saw his relationship with the family as that of a relative. Both Treas and defendant were members of the Norteño gang at the time of the shooting. However, Treas was at the top of the gang's chain of command, while defendant was a younger member engaged in smaller local drug sales. Both were in the Martinez Detention Facility in January 2009, Treas for a probation violation and defendant awaiting trial in connection with the present offense. The two requested to be roommates and were moved into the same cell on January 27, 2009.

Treas testified that gang members were required to share each other's "paperwork," all papers relevant to their custody, upon arriving in a new cell as a clearance process. Treas reviewed defendant's paperwork within two to three days of their becoming cellmates. As part of this process, defendant brought up the details of the shooting. Defendant explained to Treas he shot at the house because he believed one of the occupants was a rival gang member.

At the time he was placed in the cell with defendant, Treas had already begun discussing cooperation with law enforcement officials. Treas first discussed providing information regarding criminal activity in Contra Costa County after he was arrested in September 2008 by San Pablo Police Officer Jeff Palmieri. After Treas was sentenced but before surrendering himself to the Martinez Detention Facility, Palmieri contacted him and they discussed whether Treas was tired of living a life of dealing drugs and

2

wanted a way out. To prove Treas was a truthful source of useful information, Palmieri asked Treas if he could "give [him] a couple things [he] could . . . look into or a couple arrests." In response, Treas voluntarily showed him some houses where criminal activity was occurring, but he was not willing to commit to any future arrangement. Palmieri suggested a point system where Treas would divulge information in order to gain his trust, but Treas told him he was not sure he could do that. He did not talk to Palmieri again until he was in custody.

After surrendering himself to the jail on January 9, 2009, Treas met with FBI Special Agent Gregory Eckhart and Palmieri. Treas contacted Palmieri in mid-January before meeting with Eckhart and provided significant, specific information about crimes occurring in San Pablo. Treas testified, "[T]here was so much information that I had, they had to cut me short. . . . [T]he breadth of the information on the organized crime activity I was involved in was such that there was no conversation about particular cases at all." Palmieri made no promises to Treas for volunteering information and Treas did not ask for anything in return.

Treas described his relationship with law enforcement at this point as "more of a confession," and said he was just seeking "personal salvation," but did not feel under any pressure to cooperate as he was happy with the deal he took and had already been sentenced prior to contacting Palmieri. According to Treas, this was just the first time he had an opportunity to come clean with law enforcement and it was a "very spiritual experience" for him. Recognizing what he knew was "beyond the resources" of local law enforcement, Treas encouraged Palmieri to contact the FBI and advise them he was willing to cooperate.

Eckhart first met with Treas on January 21, 2009, before Treas and defendant became cellmates, and sought his cooperation in providing information.[2] In an effort to

---

[2] Treas testified the January meeting with Palmieri and Eckhart took place after he was placed in a cell with defendant and had obtained the incriminating statements. However, the facility log shows only two dates, January 12 and January 21, 2009, when

3

get more information than Treas had already volunteered, Eckhart told Treas if he did not cooperate Eckhart would "pursue charges against him for a methamphetamine case." Treas testified he was not threatened because Eckhart told him about the possibility of his indictment in an advisory manner. He also testified he was anticipating a federal indictment, but, of course, expressed to Eckhart he did not want to be indicted. Treas got upset with Eckhart's aggressive approach and explained to Eckhart he was coming forward with information and was not looking for anything other than "some light at the end of this tunnel," which Treas testified meant "salvation." He did not agree to be more forthcoming in the future in response to Eckhart's probing nor offer his services to avoid indictment at this time. Defendant's case was not mentioned at this meeting, and because of Treas's negative reaction Eckhart did not think he would ever speak to him again. This was the extent of Treas' discussions with law enforcement at the time of his conversations with defendant.

No law enforcement officer had knowledge of or inquired into defendant's case until Treas came forward with information in February seeking an immunity agreement for his drug involvement. In February, Treas also expressed concerns to Palmieri about early release from the facility for safety reasons. However, it was not until March 23, 2009, following his early release upon law enforcement's recommendation, that Treas reached an agreement and provided details of defendant's involvement in the shooting for the first time. Treas agreed to participate in controlled buys of narcotics and firearms with the Norteño gang, provide information to law enforcement, and testify if necessary. Eckhart told Treas he could not promise him anything, but if he remained truthful, there was a possibility of certain benefits, such as relocation, witness security, and recommendation against indictment. Treas was ultimately not indicted and upon testifying against the Norteño gang, he received approximately $30,000 for living expenses associated with relocating for his protection.

---

Treas checked out of the module. When shown these logs, Eckhart testified, assuming the logs were correct, he must have met with Treas on the latter date, January 21, 2009.

4

Defendant unsuccessfully moved to exclude Treas's testimony, but the trial court found the evidence admissible because Treas had no agreement with law enforcement prior to the time defendant discussed the crime with Treas. On April 29, 2011, a jury found defendant guilty, and defendant was sentenced to two consecutive 15-years-to-life terms.

## II. DISCUSSION

Defendant contends the trial court erred in admitting his statements to Treas because Treas was acting as an agent of law enforcement and deliberately elicited incriminating statements from him in violation of *Massiah, supra*, 377 U.S. 201.

"In *Massiah, supra,* 377 U.S. 201, the United States Supreme Court held that once an adversarial criminal proceeding has been initiated against the accused, and the constitutional right to the assistance of counsel has attached, any incriminating statement the government deliberately elicits from the accused in the absence of counsel is inadmissible at trial against the defendant. [Citations.] In order to prevail on a *Massiah* claim involving use of a government informant, the defendant must demonstrate that both the government and the informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks. [Citation.] Specifically, the evidence must establish that the informant (1) was acting as a government agent, i.e., under the direction of the government pursuant to a preexisting arrangement, with the expectation of some resulting benefit or advantage, and (2) deliberately elicited incriminating statements. [Citations.]

"Where the informant is a jailhouse inmate, the first prong of the foregoing test is not met where law enforcement officials merely accept information elicited by the informant-inmate on his or her own initiative, with no official promises, encouragement, or guidance. [Citation.] In order for there to be a preexisting arrangement, however, it need not be explicit or formal, but may be 'inferred from evidence that the parties behaved as though there were an agreement between them, following a particular course of conduct' over a period of time. [Citation.] Circumstances probative of an agency relationship include the government's having directed the informant to focus upon a

5

specific person, such as a cellmate, or having instructed the informant as to the specific type of information sought by the government." (*In re Neely* (1993) 6 Cal.4th 901, 915.)

In *Randolph v. California* (9th Cir. 2004) 380 F.3d 1133 (*Randolph*), the informant sent a letter to law enforcement requesting leniency and indicating he was a cellmate of the defendant. (*Id.* at p. 1139.) Understanding this to be an offer to testify, law enforcement met with the informant several times to discuss his possible testimony, as well as a plea deal relating to the crime for which he was being held. (*Ibid.*) The informant was returned to his cell with the defendant after his initial meeting with law enforcement.[3] (*Randolph*, at p. 1144.) Despite being told not to expect a deal, he received a sentence of probation instead of a prison term upon testifying. (*Ibid.*) In finding the informant to be a government agent, the court recognized agreed-upon compensation is often relevant, but held it is the relationship between the informant and the state that is central and determinative. (*Ibid.*) Under the circumstances, an explicit agreement to compensate the informant was not necessary because the state made a conscious decision to obtain the informant's cooperation and the informant consciously decided to provide that cooperation. (*Ibid.*) The informant obtained information because he wanted leniency, and law enforcement knew or should have known this. (*Ibid.*) On the other hand, the court held any statements obtained before the informant met with and indicated his willingness to cooperate with the prosecution team could not be the basis of a *Massiah* violation. (*Randolph,* at p. 1144.)

The trial court's determination Treas was not acting as a government agent at the time defendant gave his incriminating statements is a factual determination. If supported by substantial evidence it is binding on appeal. (Cf. *People v. Mickey* (1991) 54 Cal.3d

---

[3] While the court did not make a factual determination as to whether information was elicited from the defendant after the informant's first meeting with law enforcement, the court held any information that was, in fact, elicited after this meeting was inadmissible because the informant was a government agent at that time. (*Randolph, supra*, 380 F.3d at p. 1144.)

612, 649.)  We find such substantial evidence to support the trial court's finding the evidence was admissible.

At the time the incriminating statements were made, Treas had no express preexisting arrangement with law enforcement creating an expectation of benefit or advantage.  Rather, the information was obtained on Treas's own initiative, with no official promises, encouragement or guidance.  Palmieri and Eckhart both testified there was no agreement in place until mid-March.  Neither law enforcement officer knew of defendant's case at the time the incriminating statements were made, nor did they ask Treas to seek out information regarding the shooting.  Treas and defendant both requested to be placed in a cell together without encouragement from or the knowledge of law enforcement.

Palmieri's interactions with Treas prior to Treas's discussions with defendant did not establish an explicit arrangement.  Palmieri did ask Treas whether he wanted a way out of his life of dealing drugs, and suggested a point system in order for Treas to gain his trust.  There was, however, no promise or even discussion of monetary compensation or leniency in exchange for cooperation, Treas was never directed to get information from or about defendant, and he did not agree to provide Palmieri with any information whatsoever going forward.  When Treas later initiated contact with Palmieri he spontaneously divulged significant amounts of information without requesting anything in return.  He provided law enforcement with information he already knew, but testified he did not feel pressure to cooperate as he had already been sentenced.

At the conclusion of the January 21, 2009 meeting, Treas's first and only meeting with Eckhart before obtaining the incriminating statements, an explicit agreement had not been reached between Treas and Eckhart.  During this meeting Eckhart, hoping to elicit more information, told Treas he would pursue a methamphetamine case if he did not fully cooperate.  Treas became unhappy with the nature of his relationship with Eckhart, and did not agree to be more forthcoming in the future.  Eckhart testified he believed he might never speak to Treas again because of his negative reaction.  At this time, Eckhart

7

had not offered Treas any promises in exchange for information, and Treas had not requested anything from Eckhart.

Moreover, no implicit arrangement existed at the time the incriminating statements were made because there was no evidence the parties behaved as though there was an agreement between them, following a particular course of conduct over a period of time. Law enforcement did not direct Treas in any capacity. He was not told to focus upon a specific person or a specific type of information. Treas's discussions with defendant did not occur because he was seeking out information to report to law enforcement, but because of their gang affiliation requiring them to share paperwork. Also, there was no evidence Treas sought out or obtained information from any other inmate.

Defendant suggests Treas had a change of heart once he spent some time in custody and was no longer content with his sentence, which is why he reached out to Palmieri once in custody. Treas did not, however, bring up the possibility of early release due to concerns for his safety, or request any assistance from law enforcement until February. Defendant further argues the monetary benefits and recommendation against indictment, all of which Treas eventually received, cannot be ignored. Nonetheless, each of these benefits was the result of agreements made after the incriminating statements had been made to Treas. While Treas expressed to Eckhart he, of course, did not want to be indicted, no agreement was made to avoid indictment at the January 21 meeting.

Defendant relies heavily on *Randolph,* arguing despite the absence of an explicit agreement for compensation or promises of lenient treatment, Treas's interactions with law enforcement were sufficient to establish he obtained the defendant's statements on behalf of the government. The *Randolph* court focused on the timeline of events and made clear only the incriminating statements the informant elicited after cooperating with law enforcement were inadmissible as Sixth Amendment violations. It was under the specific circumstances of *Randolph*, where it was evident the informant was motivated by his hope for a benefit, law enforcement had discussed a plea deal with him, he had agreed to continue cooperating by testifying against the defendant, and was subsequently placed

8

back in the cell with the defendant that the court reasoned an agency relationship was established without an explicit compensation agreement.

Treas did not agree to cooperate with law enforcement until after defendant revealed his involvement in the shooting. Neither law enforcement officer nor Treas believed Treas to be cooperating with law enforcement at the time the statements were made. Though Treas had provided law enforcement with information unrelated to the defendant's case, it was not clear he was motivated by hope of gaining a benefit and he did not agree to continue assisting law enforcement in the future. In fact, Treas testified his relationship with law enforcement at the time was more of a confession. This is supported by the fact that he had not requested leniency or any other benefit from law enforcement at the time.

### *Harmless Error*

Because we find the trial court did not err in admitting defendant's incriminating statements into evidence, it is unnecessary to address the issue of harmless error.

## III. DISPOSITION

The judgment of the trial court is affirmed.

_____
Margulies, Acting P.J.

We concur:


_____
Banke, J.


_____
Sepulveda, J.*

---

\* Retired Associate Justice of the Court of Appeal, First Appellate District assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

10