J-S42004-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RAYMEIR JYALEL HAYNES | : | |
| | : | |
| Appellant | : | No. 326 MDA 2024 |

Appeal from the Judgment of Sentence Entered December 20, 2023
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0005399-2021

BEFORE:  LAZARUS, P.J., BECK, J., and BENDER, P.J.E.

MEMORANDUM BY LAZARUS, P.J.:          **FILED: AUGUST 6, 2025**

Raymeir Jyalel Haynes appeals from the judgment of sentence, entered in the Court of Common Pleas of Dauphin County, after his conviction of one count each of criminal homicide (first-degree murder),[1] conspiracy (homicide),[2] criminal attempt (homicide),[3] aggravated assault,[4] conspiracy (aggravated assault),[5] carrying a firearm without a license,[6] persons not to

---

[1] 18 Pa.C.S.A. §§ 2501, 2502(a).

[2] *Id.* § 903.

[3] *Id.* § 901(a).

[4] *Id.* § 2702(a)(1).

[5] *Id.* § 903.

[6] *Id.* § 6106.

possess a firearm,[7] and recklessly endangering another person (REAP).[8] After careful review, we affirm.

On June 28, 2021, Haynes, Deron Scott, and Correy Evans[9] were involved in a shooting on the 1400 block of Berryhill Street in Harrisburg. Haynes and Scott, who were looking for Evans, arrived near 1414 Berryhill Street in Haynes' vehicle, a 2018 white Kia Optima (Kia). **See** Trial Court Opinion, 5/3/24 at 11-12, 16, 21. Haynes and Scott, who remained in the vehicle, began firing at Evans, who fired back. **See** N.T. Jury Trial, 10/16/23, at 123, 175, 186. At the time of the shooting, Erin Lapean and her son, C.L., were on their front porch, which was located behind Evans, and were struck by gunfire, resulting in the death of Lapean and the serious injury of C.L. **See** Trial Court Opinion, 5/3/24 at 9-10, 13. Haynes was charged with the above-cited offenses and brought to the Dauphin County booking center, where the following occurred:

> [Evans was also charged at this time.] Detective [Jason] Paul[, the investigating officer,] requested [Chief Detective Corey] Dickerson to operate in an undercover role and arranged for both [Haynes and Evans] to be brought to the Dauphin County booking center. Detective Paul instructed Detective Dickerson to eavesdrop on the conversation [and observe reactions, whether physical or verbal, between Haynes and Evans. **See** N.T. Suppression Hearing, 10/5/23, at 14.]. Detective Paul gave Detective Dickerson certain information about the alleged crimes

---

[7] **Id.** § 6105(a)(1).

[8] **Id.** § 2705.

[9] Correy Evans is also known as Correy Hill. For clarity, we will refer to him throughout as Evans.

but kept it somewhat minimal. Both [Haynes and Evans] had been incarcerated themselves, on unrelated charges, at the time they were brought to the booking center. The decision was made to bring them both there at the same time by Detective Paul and to place Detective Dickerson in the cell wearing prison attire. When Detective Dickerson first arrived, [] Evans was lying on a bench in the holding cell [and asked Detective Dickerson what he was in there for. *Id.* at 14. Detective Dickerson "gave him a story line of why he was in there." *Id.*] The two of them were alone. Detective Dickerson heard someone else coming into the booking center, went to the window of the holding cell, [and] saw an individual in a brown jumpsuit. [] Evans also joined him at the window and made a comment about the individual[, saying "that's the guy I'm going through it with;" Detective Dickerson "just reiterated" what Evans said back to him. *Id.* at 14-15. When Haynes entered the cell, Haynes and Evans] stared at each other; one was seated, one was standing. They [] engage[d] in conversation and Detective Dickerson overheard that conversation. Throughout the process, Detective Dickerson did not ask any questions of either of the individuals there. . . . At a certain point, [Haynes and Evans] began realizing or questioning why they were in the cell together. At that point, Detective Dickerson [] comment[ed] to them about [how] this was crazy, [or] something to that effect, and then shortly thereafter, the arrangements ended.

Trial Court Opinion, 5/3/24, at 4-5 (some internal citations omitted).

On January 22, 2022, based on a Grand Jury indictment, the Commonwealth filed a bill of information. *Id.* at 1. On September 14, 2023, Haynes filed an omnibus pretrial motion to suppress Detective Dickerson's testimony regarding the holding cell conversation he overheard between Haynes and Evans, claiming the testimony violated his Sixth Amendment right to counsel. *See* Haynes' Omnibus Pretrial Motion, 9/14/23, at ¶¶ 5-19. After a suppression hearing was held on October 5, 2023, the trial court denied Haynes' motion to suppress.

From October 16 to October 20, 2023, Haynes was tried before a jury with co-defendants Scott and Evans. *See* Trial Court Opinion, 5/3/24, at 2. The jury returned guilty verdicts on all counts. On December 20, 2023, the trial court sentenced Haynes to a mandatory term of life imprisonment for first-degree murder. Additionally, the court sentenced Haynes to imprisonment for a period of 20 to 40 years for criminal conspiracy (homicide), 20 to 40 years for criminal attempt (homicide), 10 to 20 years for aggravated assault, 10 to 20 years for criminal conspiracy (aggravated assault), 3½ to 7 years for carrying a firearm without a license, and 12 to 24 months for REAP, all running concurrently with Haynes' life sentence. The court also sentenced Haynes to imprisonment for a period of 7½ to 15 years for person not to possess a firearm, to run consecutively with the other sentences.

Haynes filed a post-sentence motion, contending the verdict was against the weight of the evidence and seeking to modify his sentence, which the trial court denied on January 2, 2024. Haynes filed a timely notice of appeal. Both the trial court and Haynes complied with Pa.R.A.P. 1925.

Haynes raises the following claims for our review:

[1.] Whether the suppression court erred in denying relief to [Haynes] when it permitted testimony from an undercover member of law enforcement who, along with other Commonwealth representatives, took actions to provoke statements from [Haynes] while he was incarcerated, and after charges were filed against him, in violation of the Sixth Amendment?

[2.] Whether the verdict of the jury was against the weight of the evidence?

Appellant's Brief, at 4 (renumbered and unnecessary capitalization omitted).

Haynes first challenges the trial court's denial of his motion to suppress. When reviewing an order denying a motion to suppress:

> [O]ur standard of review . . . is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. [When] the Commonwealth prevail[s] before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous.

*Commonwealth v. Kemp*, 195 A.3d 269, 275 (Pa. Super. 2018).

Haynes contends that the testimony of Detective Dickerson was obtained in violation of his Sixth Amendment[10] right to counsel under the standard set forth in *United States v. Henry*, 447 U.S. 264 (1980), and, therefore, the suppression court erred by failing to suppress such testimony. *See* Appellant's Brief, at 12. In *Henry*, the defendant, who had been indicted for armed robbery of a bank, made incriminating statements to his cellmate, an undisclosed government informant who was placed there by federal agents. *Id.* at 266. The Supreme Court held that intentionally creating a situation likely to induce the defendant to make incriminating statements without the assistance of counsel violated his Sixth Amendment rights. *Id.* at 273.

---

[10] The Sixth Amendment to the United States Constitution states, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST. AMEND. VI.

Preliminarily, we agree with the trial court's determination that Haynes' Sixth Amendment right to counsel had already attached at the time Haynes was placed in the holding cell with Detective Dickerson and his co-defendant, Evans (the arrangement).[11]  **See** Trial Court Opinion, 5/3/24, at 5; **see also** N.T. Suppression Hearing, 10/5/23, at 22 (Commonwealth stating that they "do not dispute that [Haynes'] Sixth Amendment [rights had] attached [at the point of the arrangement].")[12]

The government may not use an undercover agent to circumvent the Sixth Amendment right to counsel once a suspect has been charged with a crime.  Particularly, the right to counsel under the Sixth Amendment is violated when the state's agent, or an informant working on behalf of the state, engages the accused in conversation designed to uncover incriminating information about the charges pending against him.  **See Maine v. Moulton**,

_____

[11] We use "the arrangement" to refer to the placement of Detective Dickerson into the holding cell with Evans, and thereafter Haynes, after charges had been filed but before arraignment, for the sole purpose of eavesdropping on both co-defendants and recording their statements to each other.

[12] Haynes makes a single assertion that his right to counsel under Article 1, Section 9 of Pennsylvania Constitution attached at the time of the arrangement as well.  **See** Appellant's Brief, at 14.  However, Haynes does not advance any argument on whether his rights under the Pennsylvania Constitution afford greater protection than the United States Constitution in this instance.  It is, therefore, insufficiently developed to permit meaningful appellate review, and, accordingly, we will restrict our analysis to Haynes' allegation that his Sixth Amendment rights were contravened by the arrangement.  **See, e.g.**, **Commonwealth v. Allshouse**, 985 A.2d 847, 852 n.8 (Pa. 2009) (refusing to consider issue of whether appellant was entitled to relief under Pennsylvania Constitution where appellant failed to present specific argument based on constitutional provision allegedly violated).

474 U.S. 159, 177 (1985). *See also Henry*, *supra*; *Massiah v. United States*, 377 U.S. 201 (1964).

To establish a Sixth Amendment violation, a defendant must demonstrate that "the informant act[ed] under instructions as an informant for the government, [] he present[ed] himself as no more than a fellow inmate rather than a governmental agent, and [] the suspect [was] in custody and under indictment at the time of the questioning by the informant[.]" *Commonwealth v. Hannibal*, 156 A.3d 197, 212-13 (Pa. 2016) (internal citations and quotation marks omitted). Further, "the defendant must demonstrate the police and the informant **took some action**, beyond mere listening, [] deliberately [designed] to elicit incriminating remarks." *Id.*

At the suppression hearing, Detective Dickerson testified that he was sent by Detective Paul into a holding cell to eavesdrop on Haynes and Evans. *See* N.T. Suppression Hearing, 10/5/23, at 6-7. He further testified that he wore an orange jumpsuit with no other identification. *Id.* at 18. The record is clear that Detective Dickerson was acting as an informant for the police and presented as no more than a fellow inmate in the holding cell. Further, Haynes was in custody at the time of the arrangement. *Id.* at 8-10. Therefore, the sole remaining issue is whether Detective Dickerson took some action, beyond "mere listening," deliberately designed to elicit incriminating statements from Haynes. *Hannibal*, *supra*.

The Pennsylvania Supreme Court has emphasized that "deliberate elicitation" is not limited to police conduct which constitutes direct

interrogation, but may include certain methods designed to deliberately elicit statements from defendants in the absence of counsel, such as making emotional appeals to conscience, discussing the facts of the case with him, or confronting him with evidence calculated to provoke a response, such as statements of other individuals. **Commonwealth v. Briggs**, 12 A.3d 291, 324-325 (Pa. 2011); **see also Commonwealth v. Cornelius**, 856 A.2d 62 (Pa. Super. 2004) (tour of crime scene with defendant after he invoked Sixth Amendment right to counsel was attempt to deliberately elicit incriminating statement). Additionally, employing methods to exploit known susceptibilities of a defendant based on his background, moral state, or moral belief to induce the defendant to discuss the case is also a violation of the defendant's Sixth Amendment rights. **See Brewer v. Williams**, 430 U.S. 387, 400 (1977) (police discussion with defendant about finding girl's body for "Christian burial" to purposely exploit defendant's religious beliefs violated defendant's Sixth Amendment rights).

However, "a defendant does not make out a violation of [the Sixth Amendment] by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police." **Kuhlmann v. Wilson**, 477 U.S. 436, 459 (1986) (plurality opinion), *superseded by statute as stated in* **Banister v. Davis**, 590 U.S. 504 (2020); **see also Commonwealth v. Ogrod**, 839 A.2d 294, 329 (Pa. 2003). Particularly, in **Commonwealth v. Mayhue**, 639 A.2d 421 (Pa. 1994), the Pennsylvania Supreme Court found that when a passive listener, even one

currently engaged as an informant for the police, merely remarks on his own imminent release from prison in response to defendant's unsolicited conversation, the deliberate elicitation prong is not satisfied. *Id.* at 436-37.

Here, Haynes asserts that the Commonwealth took deliberate actions in violation of the Sixth Amendment to illicit incriminating statements after the charges were filed by placing him in a holding cell with his co-defendant Evans and Detective Dickerson, who "had, at a minimum, limited discussions in order to initiate admissions related to the criminal incident." *See* Appellant's Brief, at 12. Specifically, Haynes contends that *Henry* prohibits placing him and his co-defendant in the same cell with an undercover officer because the arrangement was "clearly [intended by] law enforcement [to] provoke an incriminating statement." *Id.* at 13. Haynes relies on *United States v. Kimball*, 884 F.2d 1274 (9th Cir. 1989), and *Commonwealth v. Berkheimer*, 460 A.2d 233 (Pa. 1983), to support his argument that a jailhouse informant violates a defendant's Sixth Amendment right when the informant is sent by the police to obtain incriminating information from the defendant. Appellant's Brief, at 17-18.

We find Haynes' argument unpersuasive. Notably, in both *Massiah* and *Henry*, the informant and defendant engaged in conversation that was likely to elicit an incriminating statement. In reaching its decision in *Henry*, the High Court held that the informant's "stimulation" of conversations with the defendant in order to "elicit" incriminating information violated the defendant's right to counsel. *Id.* at 271; *see also id.* at 270 (defendant "was in custody

- 9 -

and under indictment **at the time he was engaged in conversation by the informant**.") (emphasis added).[13]

Here, Detective Dickerson did not engage in any questioning of Haynes. During the conversation between Haynes and Evans, Detective Dickerson was "playing with [his] nails or. . . eating an apple. . . doing anything not to bring attention to [himself]." N.T. Suppression Hearing, 10/5/23, at 18. In fact, Detective Dickerson's only interaction with Haynes was saying "something like, [']you know that's crazy they put y'all in here['] or something like that."[14] *Id.* at 17. This remark was made towards the end of the arrangement when Haynes and Evans began questioning why they were together in the same

_____

[13] The Pennsylvania Supreme Court cited this same factor in its analysis in **Berkheimer**, finding that a statement obtained by an informant, who presents as nothing more than a fellow inmate, must be suppressed under the Sixth Amendment "where the suspect is in custody and under indictment **at the time of his questioning by the secret agent**[.]" *Id.* at 234 (emphasis added). As in **Henry**, a major factor in determining whether a violation occurred **is the actions taken by the informant that amounted to a secret interrogation**.

[14] In his brief, Haynes notes that, in a recorded statement made by Detective Dickerson immediately after the arrangement, Detective Dickerson stated that he made another statement to Evans as Haynes was being placed in the holding cell. **See** Appellant's Brief, at 19 n.5. However, this statement is not included in the certified record. **See** Appellant's Reply Brief, at 3; **see also** Commonwealth's Brief, at 12 n.13 (unpaginated). "[W]e can only repeat the well[-]established principle that 'our review is limited to those facts which are contained in the certified record' and 'what is not contained in the certified record does not exist for purposes of our review.'" **Commonwealth v. Brown**, 161 A.3d 960, 968 (Pa. Super. 2017) (internal citation omitted). Therefore, we cannot consider any statement made by Detective Dickerson that is not contained in the certified record, nor do we speculate on its relevance.

holding cell.  *Id.* at 16-17.  The statement does not rise to an interrogation that deliberately elicits incriminating remarks.  *See Mayhue*, *supra*.

Further, the record contains no evidence that, while in the holding cell with Haynes and Evans, Detective Dickerson took any other action that could be deemed deliberate elicitation.  While the Pennsylvania Supreme Court held that "deliberate elicitation" can be found in situations where the police act in certain prohibited manners outside of questioning the defendant directly, the deliberate elicitation standard still requires action by the informant or police that amounts to an "indirect and surreptitious interrogation" of the defendant. *See Cornelius*, *supra*; *see also Mayhue*, *supra*.[15]  The Sixth Amendment is not violated by showing that a jailhouse informant reported incriminating statements to police through a prior arrangement, such as the arrangement here.  *See Kuhlmann*, *supra*.

While the police intentionally set up "the arrangement," Detective Dickerson did not act beyond "mere listening" to Haynes' and Evans' conversation.  While "confinement may bring into play subtle influences that will make [a defendant] particularly susceptible to the ploys of undercover [g]overnment agents[,]" *Henry*, 447 U.S. at 274, the Sixth Amendment does not "forbid[] admission in evidence of an accused's statements to a jailhouse

---

[15] *Kimball*, *supra*, the Ninth Circuit case Haynes cites to in his brief, also supports this conclusion.  *See* Appellant's Brief, at 17.  Therein, the circuit court held that the defendant's Sixth Amendment rights were violated because undercover agents approached the defendant to seek his assistance in locating the very money he was accused of laundering, creating a situation likely to induce incriminating statements.  *Kimball*, 884 F.2d at 1278.

informant who was 'placed in close proximity, but [made] **no effort to stimulate conversations about the crime charged**.'" ***Kuhlmann***, 477 U.S. at 456 (citation omitted and emphasis added). Accordingly, we find no violation of Haynes' Sixth Amendment right to counsel and the trial court did not err in denying suppression of Detective Dickerson's testimony.

In his second issue, Haynes contends the trial court erred in denying his post-sentence motion challenging the weight of the evidence with respect to his first-degree murder and conspiracy to commit murder convictions.[16] A challenge to the weight of the evidence must be preserved by a motion for a new trial either in a post-sentence motion, by a written motion before sentencing, or orally prior to sentencing. ***See*** Pa.R.Crim.P. 607; ***see also Commonwealth v. Lofton***, 57 A.3d 1270, 1273 (Pa. Super. 2012). Here, Haynes filed a post-sentence motion, alleging that the verdicts were against the weight of the evidence, which was denied by the trial court. The trial court addressed the weight claim in its opinion, concluding that the jury was free to believe all, some, or none of the evidence and resolved any inconsistencies by determining which evidence and witnesses were credible. ***See*** Trial Court Opinion, 5/3/24, at 25-26. Where the trial court has ruled on a weight claim,

---

[16] Haynes only argues in his brief that the weight of evidence is against his conviction of first-degree murder and conspiracy to commit murder. Haynes does not provide meaningful arguments challenging the weight of the evidence for any of his other convictions. Thus, we find those claims waived. ***See Commonwealth v. Sipps***, 225 A.3d 1110, 1116-17 (Pa. Super. 2019) (where appellant fails to develop issue in argument section of brief and fails to cite legal authority, issue is waived); ***see also*** Pa.R.A.P. 2119(a).

an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

***Commonwealth v. Cruz***, 919 A.2d 279, 282 (Pa. Super. 2007) internal citations omitted).  Furthermore,

The essence of appellate review [of] a weight claim appears to lie in ensuring that the trial court's decision has record support. Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion.  A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court.  A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion.  Rather, the role of the trial judge is to determine that[,] notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

***Commonwealth v. Clay***, 64 A.3d 1049, 1054-55 (Pa. 2013) (citations and quotation marks omitted).  The reviewing court may only reverse the lower court if the verdict is so contrary to the evidence as to "shock one's sense of justice."  ***Commonwealth v. Champney***, 832 A.2d 403, 408 (Pa. 2003) (internal citations omitted).

Haynes argues that his conviction of first-degree murder was against the weight of the evidence because Detective Dickerson's testimony proved that Evans shot at Haynes first, and, therefore, Haynes acted out of self-defense and lacked the requisite malice and specific intent to kill.  ***See*** Appellant's Brief, at 25-26.  Alternatively, Haynes argues that the evidence shows his other co-defendant, Scott, fired first and was responsible for the Lapean's death.  ***Id.*** at 22-23, 25-26.  Haynes also argues that the assertion

that he acted as a "principal, accomplice[,] or conspirator" is not supported by the evidence. *Id.* at 24. Last, he contends that, because Scott may have fired first, the Commonwealth's theory of transferred intent was "tenuous and speculative" because it relied upon conflicting and uncertain testimony of the trial witnesses. *Id.* at 24, 26.

A criminal homicide constitutes first-degree murder when it is an intentional killing, which is defined, in part, as "willful, deliberate and premeditated." *See* 18 Pa.C.S.A. §§ 2502(a), (d). To sustain a conviction for first-degree murder, the Commonwealth must prove that: (1) a human being was unlawfully killed; (2) the accused was responsible for the killing; and (3) the accused acted with malice and a specific intent to kill. *Commonwealth v. Williams*, 176 A.3d 298, 306-07 (Pa. Super. 2017).

A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

> (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
>
> (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S.A. § 903(a).

> Our Court has explained:
>
> [A] conspiracy may be inferred where it is demonstrated that the relation, conduct, or circumstances of the parties, and the overt acts of the co-conspirators[,] sufficiently prove the formation of a criminal confederation. The conduct of the parties and the

circumstances surrounding their conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt. Even if the conspirator did not act as a principal in committing the underlying crime, [he] is still criminally liable for the actions of his co-conspirators taken in furtherance of the conspiracy.

*Commonwealth v. Gross*, 232 A.3d 819, 839 (Pa. Super. 2020) (en banc) (cleaned up).

At the jury trial, Detective Dickerson testified that, during the arrangement, Haynes stated to Evans that "[Haynes] only shot because [Evans] shot first." N.T. Jury Trial, 10/16/23, at 469. Detective Dickerson also testified that Evans "never answered [the statement] verbally. He kind of just nodded." *Id.* However, several other witnesses testified to the contrary. Richelle Brown, Brianne Roman, and Rick Lapean (Lapean's husband) each testified that at least two men in a white sedan, identified as Haynes' Kia,[17] fired in the direction of Evans, Lapean, and C.L. *Id.* at 123, 175, 186. Brown testified that, although the individuals in the white sedan were wearing masks, she was able to identify Haynes as the driver because his mask had rolled up and his face was visible. *Id.* at 190. Both Roman and Mr. Lapean testified that the individuals in the car started shooting first. *Id.* at 175 (Mr. Lapean testifying, "[the shooting had to originate] from the car. . . [because] the first shot [he] heard sounded like it came from right in front of [him]."); *see also* Commonwealth's Exhibit 17 (Roman's December 2,

---

[17] At trial, Tajaaye McIntyre testified that she was dating Haynes at the time of the shooting and that she and Haynes had purchased the white 2018 Kia together. *See* Jury Trial, 10/16/23, at 302, 304, 317.

2021 grand jury testimony that the car started shooting first). Tajaaye McIntyre identified Haynes as the driver of the Kia from a still photo of the news coverage of the Berryhill shooting. *Id.* at 302, 332. Finally, Randy Springer, who was not present at the shooting, testified that, after the shooting, Evans told him that he (Evans) shot at "Sosa" (Scott)[18] in the South[19] and they followed him back to Berryhill. *Id.* at 281, 283. Evans also stated to Springer that Scott and Haynes shot at him first and he returned fire. *Id.* at 282.

Although there was evidence of gang-related tension between Evans and Scott,[20] the Commonwealth also presented evidence that Haynes had a motive to shoot Evans. Specifically, Haynes had been told that Evans had shot at Haynes' girlfriend and, shortly thereafter, Haynes drove to the area

---

[18] Bernard Rendler, a probation officer for Dauphin County and a member of the Dauphin County Gang Task Force, testified that Scott was known as "BG Sosa" or "Sosa" and was a member of the Pop Out Gang (POG). *See* N.T. Jury Trial, 10/16/23, at 421-22, 427-28. *See also id.* at 124-25, 179 (several witnesses testifying that they knew Scott as "BG Sosa" or "Sosa").

[19] The South references the Hall Manor area of Harrisburg. *See* N.T. Jury Trial, 10/16/23, at 470.

[20] Officer Rendler testified that Evans, known as "Westbrook," was a member of the All Nighter Boys (ANB) gang. *See* N.T. Jury Trial, 10/16/23, at 421-22. He also explained that, in 2021, there was known "beef" between the ANB and POG, which played out over social media, including making music videos and posting them to YouTube and SoundCloud. *Id.* at 430. Officer Rendler discussed a particular music video that Scott posted regarding an incident between Scott and another ANB member at a Dave and Buster's restaurant and opined that the level of disrespect in the video was likely to escalate the tension between the two gangs. *Id.* at 433-40.

where Evans was. *Id.* at 323, 325 (McIntyre testifying that, while out with Scott in the South, "Westbrook" (Evans) shot at them); *id.* at 470 (Detective Dickerson testifying Haynes stated he (Haynes) sought out Evans after receiving call Evans shot at his girlfriend). Detective Paul testified that, as part of his investigation of the Berryhill shooting, he reviewed text messages between Haynes and other individuals. *Id.* at 568. Specifically, Detective Paul read into the record a text exchange between Haynes and Shakira James, McIntyre's best friend, regarding the fact that McIntyre had a baby with another man. *Id.* at 569-70. In the text, Haynes stated: "I gave that bitch everything and I booted[21] for this bitch." *Id.* at 570.

Our review of the record concludes that the trial court did not abuse its discretion by determining that the jury's verdict was not against the weight of the evidence. While Haynes is correct that some testimony conflicted with other testimony, a mere conflict in testimony is not enough to grant a new trial. The jury was free to credit some witnesses' testimony over others. *See Commonwealth v. Salinas*, 307 A.3d 790, 795 (Pa. Super. 2023) ("The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none[,] or some of the evidence and to determine the credibility of the witnesses."). Although Haynes points to evidence which supports his theory of the case, he is essentially asking this Court to reweigh the evidence,

---

[21] Officer Rendler testified that when the term "to boot" is used by gang members, "it usually means action [to defend someone] . . . usually [with] physical violence." *Id.* at 440.

which we may not do. **See Commonwealth v. Miller**, 172 A.3d 632, 643 (Pa. Super. 2017) (rejecting weight claim where appellant merely asked this Court to reweigh evidence and testimony in his favor).

The Commonwealth presented evidence of eyewitnesses who saw the driver of the Kia, identified as Haynes, shoot first at Evans as well as evidence of Haynes' motive. Therefore, the jury could have reasonably concluded that Haynes intended to kill Evans. **See Commonwealth v. Gease**, 696 A.2d 130, 133 (Pa. 1997) (factfinder permitted to infer that one intends natural and probable consequences of his acts, i.e., firing multiple shots at someone resulting in death of person). This evidence also supports a theory of transferred intent, where Haynes intended to kill Evans, but instead, killed Lapean. **See** 18 Pa.C.S.A. § 303(b) (doctrine of transferred intent); **see also Commonwealth v. Thompson**, 739 A.2d 1023 (Pa. 1999), *cert. denied*, 531 U.S. 829 (2000) (if intent to commit crime exists, this intent can be transferred for purpose of finding intent element of another crime).

"Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion." **Clay**, **supra**. Here, the record supports the trial court's determination that the jury's verdicts were not against the weight of the evidence. The trial court did not abuse its discretion in denying Haynes' motion and, accordingly, Haynes' claim fails.

Judgment of sentence affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>08/06/2025</u>